# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 5, 2015          Decided July 28, 2015

No. 13-5358

COMBAT VETERANS FOR CONGRESS POLITICAL ACTION
COMMITTEE AND DAVID H. WIGGS, TREASURER,
APPELLANTS

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-02168)

*Paul D. Kamenar* argued the cause for appellants. With
him on the briefs was *Dan Backer*.

*Harry J. Summers*, Assistant General Counsel, Federal
Election Commission, argued the cause for appellee. With
him on the brief were *Kevin A. Deeley*, Acting Associate
General Counsel, and *Robert W. Bonham III*, Senior Attorney.

Before: HENDERSON, PILLARD and WILKINS, *Circuit
Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The basic facts are few and not in dispute.  The Federal Election Commission in October of 2011 imposed an $8,690 fine on the Combat Veterans for Congress Political Action Committee and its treasurer, David Wiggs, in his official capacity.  Combat Veterans incurred the fine for failing to meet three required reporting deadlines under the Federal Election Campaign Act.  Combat Veterans sued the Commission, contesting the fine and charging that the Commission's procedural errors deprived it of the power to act.

Only one of Combat Veterans' claims gives us pause.  It emerged during litigation that the Commission's voting procedures may contravene the Campaign Act.  The Commission must secure "an affirmative vote of" four of its six Commissioners to initiate an enforcement action against a person who misses a filing deadline under the Act.  52 U.S.C. § 30109(a)(2).  In polling its Commissioners to learn how they vote on an enforcement action, the Commission currently uses a voting procedure that counts as "affirmative votes" ballots that it distributes to the Commissioners but that Commissioners do not mark and return.  There is a question whether it is lawful for the Commission to treat unmarked, unreturned ballots as affirmative votes.

Disposition of this case does not, however, require that we resolve the precise meaning of "affirmative votes" under the statute, and, in particular, whether the Commissioners' silent acquiescence may be treated as such votes.  Combat Veterans has failed to show that the Commission's use of its allegedly flawed voting procedure caused it any prejudice.  The challenged votes did not result in an investigation of Combat Veterans because the filings' lateness was readily apparent from information already in the Commission's possession.  Moreover, the Commission's ultimate liability

determinations on the late filing charges were made by unanimous tally votes on marked ballots. Because we conclude that the Commission's use of its voting procedure was harmless even if it was in error, we affirm the decision of the district court.

## I.

### A.

The Federal Election Commission administers the Federal Election Campaign Act, the statute that regulates campaign fundraising and financing for federal elections. *See* 52 U.S.C. §§ 30101 *et seq.*[1] The Campaign Act requires that political committees file periodic reports detailing their receipts and disbursements. *Id.* § 30104(a)-(b). The Federal Election Commission is authorized to fine political committees that fail to meet the Act's reporting deadlines. *Id.* § 30109(a)(5)(A)-(B).

Deadlines are not all that the Commission superintends, however. The Commission's mandate is broad and its authority considerable. *See id.* § 30107. Substantively, the Act charges the Commission to enforce laws governing required public disclosures of campaign finance information, as well as limits on contributions to, and public funding of, federal election campaigns. As a procedural matter, the Act authorizes the Commission to conduct investigations, authorize subpoenas, administer oaths, receive evidence, and initiate civil actions. *See id.* Such an independent

---

[1] Until recently, the Federal Election Campaign Act was codified at 2 U.S.C. §§ 431-457. The Act has since been recodified and renumbered. *See* 52 U.S.C. §§ 30101-46. In this opinion, we cite to the current codification.

Commission holds potentially enormous power. It must decide "issues charged with the dynamics of party politics, often under the pressure of an impending election." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981).

Congress sought to limit the Commission's powers through two safeguards. First, Congress tempered the Commission's powers through structure. *See* H.R. Rep. No. 94-917, at 3 (1976); *see also* Scott E. Thomas & Jeffrey H. Bowman, *Obstacles to Effective Enforcement of the Federal Election Campaign Act*, 52 Admin. L. Rev. 575, 590-93 (2000). Congress designed the Commission to ensure that every important action it takes is bipartisan. *See Democratic Senatorial Campaign Comm.*, 454 U.S. at 37; *Common Cause v. FEC*, 842 F.2d 436, 449 n.32 (D.C. Cir. 1988). The Commission is comprised of six Commissioners. 52 U.S.C. § 30106(a)(1); *see FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826-28 (D.C. Cir. 1993) (holding unconstitutional statutory provision permitting two congressional officers to serve as *ex-officio* members). Of the six Commissioners, "[n]o more than [three] . . . may be affiliated with the same political party." 52 U.S.C. § 30106(a)(1) Many Commission actions require "the affirmative vote of 4 members of the Commission." *See id.* § 30106(c) (cross-citing 52 U.S.C. §§ 30107(a)(6), (7), (8), (9)). No Commissioner may "delegate to any person his or her vote or any decisionmaking authority or duty." *Id.* The Commission cannot sub-delegate its central powers to committees of its members. *See id.* The four-affirmative-vote, non-delegation, and bipartisanship requirements reduce the risk that the Commission will abuse its powers. As the Committee Report accompanying the creation of the four-vote language explains: "[t]he four-vote requirement serves to assure that enforcement actions, as to which Congress has no continuing voice, will be the product

of a mature and considered judgment." H.R. Rep. No. 94-917, at 3 (1976).

Congress further tempered the Commission's power by requiring a series of steps before the Commission takes enforcement action. *See* 52 U.S.C. § 30109(a); *see also* 11 C.F.R. § 111.3-111.24 (enforcement process regulations); Thomas & Bowman, *supra* at 584-90. Before it may act, the Commission must find "reason to believe" that a violation of the Act has occurred. 52 U.S.C. § 30109(a)(2). Following such a determination, the Commission's General Counsel may then conduct an investigation. *Id.* If the outcome of the investigation warrants it, the Commission may then proceed to the next stage of the enforcement process by finding "probable cause to believe" a violation has occurred. *Id.* § 30109(a)(1)-(4). Following a finding of probable cause, the Commission "shall attempt" to resolve a matter by "informal methods of conference, conciliation, and persuasion, and . . . enter into a conciliation agreement" with the respondent involved. *Id.* § 30109(a)(4)(A)(i). If informal measures are ineffective, the Commission may vote to file a de novo civil suit in federal district court to enforce the Campaign Act. *Id.* § 30109(a)(6). Notably, each of those three procedural stages—(1) a reason to believe determination, (2) a probable cause determination, and (3) the filing of a civil suit—requires "an affirmative vote of 4 of [the Commission's] members" before the Commission may proceed. *Id.* §§ 30109(a)(2), 30109(a)(4)(A)(i), 30109(a)(6).

## B.

In 1999, Congress amended the Campaign Act to create a special, streamlined set of procedures for efficiently imposing fines on covered persons for routine filing and record-keeping violations, such as the late filings at issue here. *See id.* §

30109(a)(4)(C); 145 Cong. Rec. 16,260 (July 15, 1999) (statement of Rep. Maloney) (noting that the bill "contains several provisions that will help the agency operate more efficiently," by mandating some electronic filing and creating "a system of 'administrative fines'—much like traffic tickets, which will let the agency deal with minor violations of the law in an expeditious manner"); 145 Cong. Rec. 21,725 (Sept. 15, 1999) (statement of Rep. Maloney). With those amendments, Congress sought to make it easier for the Commission to enforce the Campaign Act's deadlines. As the Committee Report accompanying the amendments to the Act explains, the Administrative Fines Program "create[d] a simplified procedure for the FEC to administratively handle reporting violations." H.R. Rep. No. 106-295, at 11 (1999).

An administrative fines proceeding under the amended Act thus involves fewer hurdles than other Commission enforcement proceedings. *See* 52 U.S.C. § 30109(a)(4)(C). To impose an administrative fine, the Commission makes a reason-to-believe determination just as it would in any potential enforcement proceeding. *See id.* § 30109(a)(2). The Commission then furnishes a person with "written notice and an opportunity to be heard before the Commission." *Id.* § 30109(a)(4)(C)(ii). Once that notice and opportunity has been afforded, however, the streamlined administrative fines authority permits the Commission to find—without making a probable cause determination and without filing an action in district court—that the person violated the Act and require that she or he "pay a civil money penalty." *Id.* §§ 30109(a)(4)(C)(i)(I), (II). In administrative fines proceedings, Congress shifted the burden of seeking judicial review in federal district court to the party against whom the Commission makes an adverse determination. *Id.* § 30109(a)(4)(C)(iii).

## C.

The Commission uses a twenty-four-hour, no-objection procedure to make reason-to-believe determinations in administrative fines cases. The no-objection vote is one of two "circulation vote" procedures that the Commission set forth in Directive 52, *FEC Directive 52* (Sept. 10, 2008), http://www.fec.gov/directives/directive_52.pdf, pursuant to its statutory authority to promulgate "rules for the conduct of its activities," 52 U.S.C. § 30106(e). The other procedure is a tally vote. *FEC Directive 52*, *supra* at 2. The no-objection and tally vote procedures enable the Commission to conduct votes when the six Commissioners are not physically present together at a meeting.

A twenty-four-hour "no objection" vote refers to the practice of circulating paper ballots to each Commissioner's office, receiving and counting marked ballots, and counting as "yes" votes any ballots not marked and returned within twenty-four hours. *Id.* at 3. A tally vote, by contrast, refers to the practice of circulating paper ballots, receiving and counting marked ballots, and deeming ballots not returned by the deadline (within a week) to be abstentions, i.e., to *not* count as "yes" or "affirmative" votes. *Id.* at 2. In both cases, the Commission Secretary certifies the results of balloting promptly after the voting deadline has passed. Any single Commissioner's objection to making a particular decision by no-objection vote, however, has the effect of placing the matter on the agenda for an in-person vote at a Commissioners' meeting. *Id*. at 3. If, in an administrative fines proceeding, a respondent challenges a reason-to-believe determination, the Commission will use a tally vote to make the final determination as to whether to impose a fine. *Id*.

**D.**

In late 2010, the Combat Veterans for Congress PAC missed three deadlines for filing election reports under the Campaign Act. Over the next four months, pursuant to staff recommendations, the Commission used its no-objection procedure to make three separate determinations that there was "reason to believe" that Combat Veterans had missed a reporting deadline. In the vote regarding the first late-filed report, only three Commissioners marked and returned their ballots; in the second, only two; and in the third, again, only three Commissioners returned marked ballots. In each instance, the Commission Secretary certified that the Commission had "[d]ecided by a vote of 6-0." J.A. 105, 238, 344. The Secretary further certified that, in each case, all six Commissioners "voted affirmatively for the decision." J.A. 105, 238, 344.

Combat Veterans challenged each of the Commission's reason-to-believe determinations. It admitted that the reports were filed late, but disclaimed liability because it believed that Combat Veterans' former treasurer, Michael Curry, was solely responsible for missing the deadlines. In October of 2011, the Commission unanimously found that Combat Veterans and its current treasurer (in his official capacity) were liable for $8,690 in civil penalties. The Commission made that unanimous finding by a tally vote of the Commissioners, after Combat Veterans and its treasurer had been provided written notice and had taken advantage of their opportunity to respond.

Combat Veterans petitioned the Commission for reconsideration, a hearing, and mitigation of the fine, all of which the Commission denied. Combat Veterans and its current treasurer filed a timely petition for review in the

district court. *Combat Veterans for Cong. Political Action Comm. v. FEC*, 983 F. Supp. 2d 1, 9 (D.D.C. 2013). On cross-motions for summary judgment, the district court rejected all of Combat Veterans' claims and granted judgment to the Commission. *Id.* at 5, 11-21. This appeal followed.

## II.

### A.

The Commission's twenty-four-hour, no-objection voting procedure must comport with the statutory requirement that the Commission, when it takes action to investigate reports of suspected violations, do so only "by an affirmative vote of 4 of its members." 52 U.S.C. § 30109(a)(2). That requirement is a cornerstone of the Commission's governance structure. *See id.* §§ 30106(c), 30109(a)(2), 30109(a)(4)(A)(i), 30109(a)(6). The four-affirmative-vote requirement prevents partisan misuse of the Commission's powers and safeguards individuals from erroneous deprivations of rights.

This matter, which the Commission pursued through its streamlined Administrative Fines Program, involved a straightforward determination that Combat Veterans' filings were late. The Commission did not exercise here any of the important powers—including the powers to make "field investigation[s] or audit[s]," issue interrogatories, conduct depositions, and issue subpoenas—that it may bring to bear in more complex cases once it has found a reason to believe a statutory violation has occurred. *See id.* §§ 30106(c), 30109(a)(2); *see also id.* § 30107(a)(1)-(4). The statutory provision that governs voting in the streamlined Administrative Fines Program, however, equally applies to other, more serious and sensitive Commission enforcement actions. *See id.* § 30109(a)(2). At least in theory, then, the Commission's interpretation of section 30109(a)(2) to permit

it to use no-objection voting might equally authorize the Commission to initiate investigations in complex, sensitive, or major cases by no-objection voting. In those cases, any voting inadequacy could have significant effects because the reason-to-believe determination opens the door to the Commission's use of powerful and intrusive investigative techniques.

Petitioners contend that, even in this simple case, no-objection voting violates the statutory command that reason-to-believe determinations be decided by an "affirmative vote" of four Commissioners. They read the statutory reference to "affirmative" voting to mean voting by positively taking action, i.e., doing more than acquiescing by doing nothing. Yet, they observe, the no-objection voting the Commission uses in its Administrative Fines Program fails to require that the Commissioners mark ballots, nor even that Commissioners' offices keep any record of Commissioners' votes on such matters.

Petitioners claim that no-objection voting creates the unacceptable risks (a) that a Commissioner's view might be recorded mistakenly, or (b) that the Commissioner might not even develop a view before the deadline. A Commissioner could be on vacation, out of the country, in a hospital bed, or her email could be malfunctioning, or simply ignored and unopened. If a Commissioner failed to learn of a ballot, her silence could inadvertently cast "yes" votes even on issues she opposes. Petitioners note that Congress's purpose of requiring four affirmative votes was to "assure that enforcement actions, as to which Congress has no continuing voice, will be the product of a mature and considered judgment." H.R. Rep. No. 94-917, at 3 (1976). The no-objection procedure, however, arguably makes it easier for Commissioners to give their blanket assent despite Congress's

intention that each matter receive individualized consideration.

The question whether no-objection voting complies with the statutory requirement to act by "four affirmative votes" may be a substantial one but, for the reasons that follow, we need not decide it in this case.

**B.**

Even assuming the Commission's use of its no-objection procedure was in error, Combat Veterans has failed to show any likelihood that any material Commission action or decision would have been different had a tally voting procedure been used for the reason-to-believe decisions. We therefore hold that any error was harmless.

"In administrative law, as in federal civil and criminal litigation, there is a harmless error rule." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659-60 (2007) (quoting *PDK Labs, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)). That rule "requires the party asserting error to demonstrate prejudice from the error." *First Am. Disc. Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (internal quotation marks omitted). The party claiming injury bears the burden of demonstrating harm; the agency need not prove its absence. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010); *see Shinseki v. Sanders*, 556 U.S. 396, 409-10 (2009). In discussing harmless error in the context of the Administrative Procedure Act, the Supreme Court has counseled:

> [T]he factors that inform a reviewing court's "harmless-error" determination are various, potentially involving, among other case-specific factors, an estimation of the likelihood that the result

would have been different, an awareness of what body (jury, lower court, administrative agency) has the authority to reach that result, a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings, and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference.

*Shinseki*, 556 U.S. at 411-12.

The Commission's use of its twenty-four-hour, no-objection voting procedure was harmless for three reasons. First, even if a reason-to-believe determination had been erroneously made, Combat Veterans has not explained how it was prejudiced. A reason-to-believe determination, without more, is a mere allegation of wrongdoing. All the Commission did as a result of that step was, in each case, to notify Combat Veterans of the allegations against it and give it an opportunity to respond. The Commission did not use any of its reason-to-believe determinations as grounds to subpoena, depose, or otherwise investigate Combat Veterans. Combat Veterans responded to the Commission's allegations by admitting that the reports were filed late, advancing arguments as to why it nonetheless should not be held liable, and requesting reductions in the proposed fine. Combat Veterans has failed to carry its burden to show how an erroneous reason-to-believe determination in this case, if indeed an error occurred, caused it any prejudice.

Second, there is no hint of any suggestion that the Commission would have made any different determination even if it had used a tally voting procedure at the reason-to-believe stage. The Commission staff recommended that the

Commissioners find reason to believe the deadlines had been missed, and the dates on the reports showed they had in fact been filed late. No evidence has been introduced to show that there was any irregularity in the votes undertaken by the Commission in this case. Combat Veterans' sole assignment of error is the Commission's use of the no-objection procedure itself.

Third, under our precedent, the Commission's ratification of a defect in a reason-to-believe finding by a subsequent, valid tally vote is sufficient to remedy the earlier error. In *Federal Election Commission v. Legi-Tech, Inc.*, we considered a case involving three separate votes—to find reason to believe, to find probable cause, and to institute an enforcement action against a party—that the Commission took while it was unconstitutionally composed. 75 F.3d 704, 705-06 (D.C. Cir. 1996). After the Commission voted but before the *Legi-Tech* litigation was over, the decision of another case in our court held unconstitutional that portion of the Campaign Act that included on the Commission two *ex-officio* congressional officers not appointed by the President, and accordingly voided enforcement actions the Commission had initiated while it was unlawfully constituted. *See NRA Political Victory Fund*, 6 F.3d at 828.

During the pendency of *Legi-Tech*, the Commission responded to *NRA Political Victory Fund* by voting to reconstitute itself as a six-member body and exclude the *ex-officio*, non-voting members from all proceedings, thus correcting the constitutional defect in its composition. *See Legi-Tech, Inc.*, 75 F.3d at 706. The recomposed Commission then voted, *inter alia*, to ratify the prior votes Legi-Tech had challenged. *Id.* We held that the Commission's ratification remedied the constitutional infirmity in the prior votes—even though we were willing to

assume that the Commission's unconstitutional structure had prejudiced Legi-Tech. *Id*. at 708-09.

This case is far easier than *Legi-Tech*. The purported infirmity in the Commission's procedure here was statutory rather than constitutional. And, as noted above, there was no prejudice to Combat Veterans. The Commission was preparing a civil suit for damages against Legi-Tech, whereas it merely assessed an administrative fine against Combat Veterans. None of the potentially intrusive investigative powers that a reason-to-believe determination generally authorizes were deployed against Combat Veterans, where prima facie liability for the fines followed from the fact that the reports were filed later than they were due.

We are confident both that the reason-to-believe determinations in this case caused Combat Veterans no prejudice and that the same determinations would have been made even if the Commission had taken a tally vote. In any event, any prejudice Combat Veterans might have suffered was rendered harmless by the Commission's subsequent ratification of its reason-to-believe finding with a concededly valid tally vote. We therefore conclude that the Commission's use of its allegedly flawed procedure was harmless.

## C.

Finally, because a dispositive number of the ballots the individual Commissioners submitted to ratify the Commission's ultimate determination to fine Combat Veterans were signed by a staff member acting on the Commissioner's instructions, we must address whether such a ballot is validly cast. We hold that it is. The practice is reasonable, not proscribed by statute, and rooted in longstanding principles of agency. *See, e.g.*, *Nisi prius coram*

*Holt*, 12 Mod. Rep. 564, 564 (1701) (Holt, C.J.) ("[I]f a Man has a Bill of Exchange, he may authorize another to indorse his Name upon it by Parol; and when that is done, it is the same as if he had done it himself."); Joseph Story, Commentaries on the Law of Agency § 50, 56-57 (4th ed. 1851) (explaining that agents may be verbally authorized to sign unsealed documents on behalf of principals).[2]

**III.**

Combat Veterans' other challenges to the Commission's fines require little discussion. In addition to its voting procedure claims, Combat Veterans argued to the Commission, the district court, and this court that its former treasurer, Michael Curry, made it impossible for Combat Veterans to file its reports on time. In the days immediately preceding mandatory deadlines for several filings under the Campaign Act, Curry suddenly, and for reasons never clarified, left his post as Combat Veterans' treasurer. With Curry went all of the Committee's institutional knowledge: passwords, awareness of the contents of its records, bank deposit slips, bank statements, donor lists, and the expertise to submit reports to the Commission electronically. Combat

---

[2] Combat Veterans makes additional, technical objections to the Commission's voting procedures, including (1) that Directive 52 is void because, Combat Veterans assert, it was promulgated in secret in violation of the Sunshine Act, and that many of the Commissioners' votes are invalid because (2) the ballots were not tendered in strict compliance with Directive 52, or (3) were received after a ballot deadline but counted anyway. The Court's resolution of this case on harmless error grounds, coupled with the fact that—even accepting Combat Veterans' technical objections— at least four of the Commission's ballots in its final tally vote were valid, means that those claims need not be addressed.

Veterans' view is that Curry's "reckless and willful misconduct"—his "malfeasance"—was akin to a natural disaster, impossible for the organization to have anticipated, and impossible to rectify in time to meet the relevant statutory deadlines. Appellant Br. 48-55. Combat Veterans maintains that both law and reason dictate that the Commission should have held Curry, and only Curry, liable for the missed deadlines and, short of that, should have mitigated the fine in light of Combat Veterans' alleged use of its best efforts to overcome Curry's obstruction.

Denial of Combat Veteran's claims requires no explanation beyond what the district court provided. *See Combat Veterans*, 983 F. Supp. 2d at 11-18. We affirm for the reasons given by that court. The district court held, and we agree, that: (1) the Commission reasonably interpreted the Campaign Act to permit it to fine both Combat Veterans and its treasurer in his official capacity for missing filing deadlines, *id.*, at 11-14; (2) disagreement with a Commission decision not to take action against someone else is not grounds for a petition seeking reversal of an administrative fine against oneself, *id.* at 14-15; (3) the Commission's decision not to mitigate penalties against Combat Veterans because of Curry's misconduct was not arbitrary and capricious, *id.* at 16-17; and (4) the Commission's regulation setting forth the circumstances in which it will mitigate damages is not arbitrary or capricious or inconsistent with the Campaign Act, *id.* at 17-18.

\* \* \*

For the foregoing reasons, we affirm the decision of the district court.

*So ordered.*